May it please the Court, Counsel, Grant Eddy for Jose Enrique Hernandez. The day before the trial was to begin in the court in motions of limine, the prosecution handed me some documents, and it included the DEA, some DEA notes. And that was the first time I had any inkling that there was something in that mixture that was insoluble. That raised a very significant issue for me at that time, for the first time, because the client's story that was going to be testified to was that he was coming across the border as a decoy, supposedly with an empty vehicle, and some people that had hired him in Mexico were going to steal the drugs. Well, in fact, this was an indication that the client apparently was duped into transporting a substance that had an insoluble item in it. Some cocaine, apparently, but there was something else in there, insoluble. And why would it be insoluble if it was going to be brought into the United States, sold, put into the marketable situation, because you obviously couldn't snort a mixture involving cocaine, and something is insoluble. That wouldn't go into your bloodstream, and I would have the opportunity to presumably obtain expert testimony, testing, to verify that. But common sense would indicate that would be the case. All of that became apparent issues for the first time the day before trial. And to hand me that at the in limine meeting or session would be clearly a violation of the Brady rule, Rule 16, due process, everything. I had a right to handle it, and it was denied to me, not necessarily officially. You got a summary. Is that what you're saying? You got a summary that gave kind of bottom line testing results, but you were handed something different. Is that what you're saying? Right. Initially, the discovery says this was cocaine, and there was a mixture of cocaine. But for the first time, the notes said, and they're here in the supplemental excerpts of record on page 1 of this. And right there, it's not a very big item, but it says insoluble. Right. Right there in about the middle line. That's for the first time it says it's insoluble. Well, that was a dead giveaway that something is strange going on here. And I had a right to know what that was. Subsequent testing showed that, amazingly, the mixture, 87.7 percent was insoluble. That's not a normal situation. So that supports the client's theory or story that he ultimately testified to. But I thought that this was an empty vehicle. And, in fact, what the law says, it doesn't make any difference what percentage it is, it doesn't make any difference. And it's obvious it's cocaine. And so it's cocaine. If there was a concern about there being insoluble materials in there, wouldn't you test for that reason, if that was something that was important to know? Yes, I would. And, in fact, the first time I knew it was insoluble was the day before trial. That never has happened in 50 years of trying cases. Criminals don't put insoluble stuff into cocaine that would have to be basically that would make it unmarketable. They don't ever do that. Well, why do you think they did it in this case? Because obviously it happened. Sure. Sure. For the first time, the day before trial, it became obvious why this happened. The client is given a story. You're going to be driving this vehicle over here, and it's going to be empty. Well, that wouldn't work, because apparently the criminals in Mexico wanted my client to be arrested. It had to be a matter of record. My client was duped, and that's what he testified to. He actually said, I thought this vehicle was empty. So what the criminals did in Mexico was he was given this essentially bunk, and they got to steal 87.7% of it. They had to have the other people that they stole this from in Mexico believe everything was taken over by the officials at the border. They had to have that as a matter of record. Now, were you able to make this argument to the jury? Yes, I did.  And what about the upset? Oh, pardon me. Was I able to make the argument that I was able to make the argument that the client thought it was empty, but I wasn't able to show that it was 87.7 insoluble? That was done in the post-trial testing. I had a right to have that done before the trial. I couldn't argue to the jury, wait a minute, there was 87.7% of this was insoluble. So now what case says that you have the right to have the testing done to say what amount of the drugs was cocaine? I mean, I think there's only a measurable amount that has to be detected in order for the statute to apply. True. So what would require the government to test for anything other than the measurable amount that triggers the statute? Well, the same basis that gave Judge Burns the basis for ordering the post-trial testing, the reason is that it would support the defense argument. Brady, for example, is the as a basic decision that says I have a right to any information that would support the defense. That information supports the defense. It is the defense. And this is a violation of the Brady case specifically. It's also a violation of Rule 16. It's also a violation of a constitutional due process to deny me that until after the trial. Well, the reason you probably would have it tested after trial is for sentencing purposes, to determine exactly how much there was for sentencing purposes that you wouldn't necessarily have to have for a conviction. Would you agree with that? Well, it is – it does relate to sentencing possibly, but it also relates to guilt or innocence because it supports the defense theory that I'm just driving this over here thinking this vehicle's empty, and here I'm being deceived by these people that actually put this bunk in there. I would have been able to argue that to the jury, but I was precluded from doing it because I didn't have the testing to show it was 87.7 insoluble. I would definitely have made that argument to the jury, look, here's the defense – here's what exactly happened, instead of having the client get up there and say, I just thought the car was empty, and I was – I was just mistaken about it. It would have been far more powerful to be able to say, look, the testing that you did, the testing shows that, in fact, this supports the client's testimony that it was the gangsters in Mexico that were engineering all this. So if you had been able to get the entire report, what would you have done with it? I would have, first of all, seen, number one, that it's insoluble. I would have had it tested as it was, in fact, tested, and then had it – I would have had it found that it was insoluble, as they did find, exactly, and I would have found 87.7 was insoluble, and all of that expert testimony would have supported my argument that, in fact, the client was duped into bringing this over here, and I would have argued that he was duped by having a load of bunk or something that was only 13, 12.3 percent cocaine, and that gave the opportunity to the criminals in Mexico to steal 87.7 percent, probably almost, you know, hundreds of thousands of dollars' worth of stuff. It would be a cover for them to protect themselves against the people that they needed to be protected from, the other criminals that they stole it from. Clearly, this was an operation in Mexico, no doubt, involving different layers of criminal individuals, and the people that put it in the car apparently were the people that my client dealt with and was being paid by, but those people who were the loaders were apparently stealing 87.7 percent of cocaine. That's a lot of money, and that would be something like a lot. My question was, when I looked at the page two that you received the day before trial, it indicates, as I understand it, your argument on the insolubility is in the middle of the page. MC04, insoluble, suspect lactose. Is that the basis for your position? Yes. And so I guess, is there anything that would have precluded you at trial from exploring whether or not lactose is a standard cutting agent used with cocaine? Well, there are questions that I don't know the answers to, and that would have been a bad idea, and so I didn't do that, but I mean, I didn't do that. But suspect lactose is a situation that wasn't actually told to me when, you might see in the transcript, I did talk to the, I did cross-examine the agent about the item, and I got him to indicate that the majority of it was lactose, but he didn't say insoluble. So that's the difference. I didn't get the insoluble thing out at the time of trial, because I didn't know about it. But I did have this, but I didn't know basically the relationship between insoluble and lactose, and I did not explore that for those reasons. I did not know what the answers would be. And is there anything in the record that indicates whether or not lactose is a standard cutting agent, or it's more akin to the cornmeal issue in the Robbins case? No, I did not go into that, and I did not know the, as I say, they did not know the answers to it, but it was just brought out that it was lactose. Yes. Thank you. And so for those reasons, basically, it was obviously very, very important for me to have that beforehand, and I just didn't have it. For that reason, I'd submit that that alone would be a sufficient reason to return this matter for a retrial, or alternatively, in a, if that is not done, at least a resentencing because basically under the law, if this is a cover as opposed to a mixture, then basically you take out the amount that you're talking about here. Was he sentenced on the basis of the entire amount? What was he sentenced on? He was sentenced on the entire amount. That's the point. And so Judge Burns was not happy about having to do that, to be blunt about it. I read that. No, he didn't want to do it. No. He didn't think it was warranted. He didn't think it was. So here's what, if you agree to this, my argument, on the resentencing, if you don't remand it for a retrial, resentencing, as I calculated, 87.7 percent of this case would have been this amount. If you take off that amount, you will wind up with 12.3 percent, which was security, not this other, whatever this unsoluble stuff was. The other mixture that involved cocaine would be, the total amount of the weight was 10.52. If you multiply 12.3 percent, after you deduct that 87.7 percent, you get about 1.2 kilograms of cocaine. And obviously that's in an area which involves a five-year mandatory minimum. And if you double that, as you would, as Judge Burns had to do, you get to 10 years. And that's exactly what Judge Burns, I know, would think, thought was the appropriate time. My client wouldn't agree with that. So what authority would the trial judge have to do that after the jury had determined it contained at least 5 kilograms of a mixture, including cocaine? That is the point, and a point, and the reality is that he would have the authority to do that if you reversed that portion of the decision based upon the facts and the law here, and to determine that, in fact, it was not more than the 5 kilograms, it was less, based upon the application of the law to the facts in this case. And you have the authority to do that based upon that. To set aside the jury finding? That is, the jury did have to find it was more than the amount that you want to mention. Right. You're saying that we have the authority to set aside that jury finding? I think so. So what case most strongly supports your argument that we have the authority to set aside the jury finding on the amount of the drugs? I believe that would be based on the law, the general law, due process. I don't know of a specific case that would do that. You would be setting aside, you can certainly set aside a portion of the judgment. And the fact that's a little bit problematic because the finding of the drug amount has to be made by the jury. That's the problem, you know. That is true. That's why it's given to the jury. So conceptually, it's hard for me to think how judges can set that aside and make a different finding. Well, we did have a motion for a judgment notwithstanding verdict. We have to judge it. And that is indeed a part of the inherent judicial authority to make such a ruling if the facts and the law are not consistent. This is not a factual question. It is, in fact, a legal question whether or not that particular amount of substance can be calculated to be a part of the quantity in question. And I believe based upon the inherent law of judgment notwithstanding verdict, Your Honor, the courts certainly would have authority to do that. But if in any event we are asking for a remand for retrial on that issue, that would be another reason for simply deferring for a retrial if, in fact, that is not something that the judges are able or willing to do. Did you ask the district court for a new trial as well? As I recall, I believe I can't recall. I'm not sure. I'll have to check that up. I believe I did file motions for judgment. I'll have to check that out. We have time left if you want to reserve it. The other issues are whether or not Judge Burns should have allowed as extensive questioning and information regarding the prior act. You did file a motion for a new trial. I see it at ER 18. All right. You filed a motion for a new trial. Yes, I think I did. No, you didn't. It's at ER 18. Okay. Yes. Normally, obviously, it is on this matter of prior acts and the prior convictions. You can certainly, it was certainly proper to have the jury noted that there were felony conviction and prior acts. But I think the judge allowed too much specifics on it. And those specifics included things like allowing questions about prior smuggling attempts, whether he was working with drug traffickers, noting marijuana was in the agents after the arrest. It got into so much specifics that it ultimately meant that the probative value was outweighed by the prejudice, I'd submit. Because they were rather remote in time. They were. And also, yes, the 96, that was a 96 incident, was fairly remote, yes. And that one allowed the questions, well, you were working with drug traffickers, weren't you? You had marijuana in the gas tank. You lied to the agents when you got arrested, going into all those specifics. And I believe it should have been limited to the question of basically the question of whether or not the incident occurred without those specifics. And also felony conviction should have just been mentioned. You were convicted in 2009 for a felony, but yet they were allowed to ask, you smuggled marijuana. And so there was the judge mentioned that, and he allowed it because, as he noted, it was not just these matters he thought went not only to knowledge, but to credibility. He allowed these questions to go to credibility. And that was why it meant that the prejudicial effect outweighed the probative value. And that's another reason why I think this matter should be either amended right now, the judgment amended, and make it let it be a 10-year amount rather than a 20, or remand it for a re-sentencing. And if it is, I think Judge Burns would order 10 years. This should never have happened. This whole case should never have happened this way. And there was a lot of attempts to have this case settled, although those issues aren't really before the court. But this is why it got this way, to be blunt about it. Nobody wanted this man to go away for 20 years, including the prosecution, to be frank about it. Nobody wants this man to be in this situation for 20, 10 years is more than enough. Thank you very much. All right. Thank you, counsel. Good morning, Your Honors. May it please the Court. Jason Wandel for the United States. I'll focus my comments mostly on the issues that have been discussed this morning, specifically the matter of the insolubility of the substance. That seemed to take up most of the discussion. I would note that the insolubility, whether or not the lactose or any of the ingredients with the cocaine in the mixture was insoluble, is nowhere found in the record as far as that statement. I don't see anywhere in the facts where the word insoluble is even used, including during the cross-examination of the chemist. It is added in the notes which were provided by the supplemental excerpts record that Mr. Eddy had a chance to cross-examine the government chemist and chose not to do so. Now, I certainly acknowledge his point. You don't want to ask a question on cross you don't know the answer to. But in this case, he had clearly a statement of a note written by the witness for which you can impeach him if you ask the question, isn't it true that this ingredient was insoluble? If he said no, well, then he'd have a reason to impeach him with his notes that were provided prior to trial. One day before. Actually, Your Honor, I think the record where I read the record is the prosecutor gave it the Friday before, but that's just a few days before, and I've acknowledged that. You were not the trial lawyer? I was not, no. And I also think the record should be cleared, Your Honor, that the actual lab report which was provided to the defense was provided on March 21st, approximately four weeks before the trial. That report, which we commonly refer to as DEA-7, provided three points for the Mr. Hernandez. One is that the active drug ingredient was cocaine hydrochloride. Two, that there was another ingredient in there, the unpronounceable word which has the abbreviation PGHIG, the adulterant. And third, under a column, and this is on, excuse me, this is experts record page 87 is where you can find the report, a column which is devoted to purity or concentration, of which there's several dashes, which I think indicates to the reader, the audience, that purity wasn't tested in this case. So I would submit that back a month, 28 days, 27 days before the trial, Mr. Hernandez was on notice that this substance was not tested. And if that was the case, if his defense hinged on the purity of the substance and that this was bunk, it would seem that it was then, not a day before trial, that he had noticed and then he could have raised it to the court. We want another report. Not to the court, just to the government. Ask the government, you know, hey, can I get more information? Well, why did the government think it necessary to give this document to the defense then the Friday before trial? Because at that point we decided that the chemist was going to have to testify and the prosecutor, when I read the record, indicated that she didn't interpret that as jinx, that he should be able to be cross-examined on the notes that he did as part of the report. So that's when she requested those. And she took you to the Friday before the trial began to determine that the chemist would have to be called? No, I wouldn't suggest that. I would suggest that, reading the record, the prosecutor was under the impression that she didn't have to give those notes until after he testified because she wanted to give them before. Oh, you thought it was jinx material. Yes, yes. But that she still thought, you know, there's no reason to withhold it, so she gave it before the trial, several days before. And that's why I would submit that we actually exceeded our discovery obligations in this case. We have no interest. When I say we, the government has no interest in hiding the ball on something like this, those notes where I read them are incomprehensible to me, frankly. But I can see why they might be useful to a defendant defending a drug case. But again, there is no evidence that insolubility in any way makes it unconsumable or can't be transferred in chain of commerce. For instance, is it insoluble in water or is it insoluble in ethanol? These are all questions that there's no confident evidence in the record. So the Court had a sentence based on what we had, which was 9,989 grams of a substance containing a particular amount of cocaine. The government met its discovery obligations. But I thought only 12.3 percent of it was actually cocaine. That's correct, Your Honor. That is. But I believe the way the statute is written, and this is the way the Court interpreted it as well, he had no discretion. That's the way the statute is written. The entire substance counts. So you could have, like, one gram of cocaine and 99 percent lactose and you would be subject to a 20-year minimum? To answer that question, specifically, I think that would be a detectable amount. Now, hopefully it wouldn't get that far. Hopefully, you know, we would, prosecutors would look at a situation like that and work out a resolution. But, yes, to answer your question, I think one gram would be a detectable amount. As Justice Lindquist has forthed in Chapman, he discusses that and he gives examples in heroin cases and cocaine cases where sometimes the purity is so small that it doesn't matter because Congress still had the intention of punishing people who get this stuff on the streets. The 9,989 grams of substance in this case equals over 2,800 8-balls that still would have hit the street if this would have got through. Well, hypothetically, let's say there are 20 packets of cocaine and only one has a small amount and you've got all these 20 packets and then the DEA agent comes in and mixes them all together, the chemist, to determine the composition. Would it be your position that all 20 are a mixture containing cocaine or only the one? In those narrow facts, assuming that those packets were there, then again, not mixed up again, I would say, yes, still, that it would still be under the statute in the big pack a detectable amount of cocaine in there. But, again, now you have a situation in our case where the chemist testified that he noticed cocaine. He detected cocaine in each of the packages on a primary test. We don't have to decide that. Right. Exactly. That's not the force at this point. That would be a tougher case. But it is a fair question, Your Honor. It is a fair question for equity and fairness. But it should be pointed out also that this other ingredient, which was disclosed to Mr. Hernandez in that first report that we gave a month before trial, that the PTHIT is also in there. What is that? Well, there's nothing in the record that develops that. The chemist wasn't questioned about it. So I can't rely on that. But it is in the record that it was in there. An open source search of it will tell you that it is an extremely nasty adulterant, which is used to make the coke look more pure and bulky, and has really nasty side effects. Another reason why, if we're talking about fairness, the fact that this stuff is hitting the street and people are ingesting this is still a relevant consideration. So I would rely again on that. The theme of insolubility was never raised by Mr. Hernandez at trial at all. He did extensive cross of the government chemist and was able to elicit his main theory of the case, that the substance was predominantly sugar, predominantly lactose. He listed that three times from the chemist. The jury heard it and nevertheless determined that the government had met the standard of 5 kilograms or more of cocaine. Do you agree with opposing counsel's suggestion that we can set aside the jury's determination and find as a matter of law that the amount of the cocaine was not as found by the jury? I do not agree. I believe there was sufficient evidence, the only evidence. He was qualified as an expert. The exhibit was admitted into evidence, and there was sufficient evidence for the jury to find that it was indeed a mixture of substance containing a detectable amount of cocaine. And I believe 12 percent, while it's not as high as the trial judge very frankly said he sometimes sees, I think that's more than a trace amount, especially when you look at it in light of the Robbins case, which is cited heavily by defense counsel. In discussing the 404 and 609 admissions, because Mr. Eddy also discussed those, obviously the standard on that is abuse of discretion. Those are always questions which can be reviewed. I'm really troubled by the remoteness in time of those convictions. Yeah. Your Honor, I note that in my brief I do note a one case, a case, a Johnson case, in which the Ninth Circuit, this Court, found that 13 years prior was not too  It was 16 years prior. Right. So the question is, is it abuse of discretion for the Court in this case to allow it? I would note that in the NLM hearing, Judge Burns said no at first. He said, I'm not going to let you enter that into your case in chief. Remoteness was one issue. The other issue was he didn't have as much facts as in the Federal conviction from 2009. But he did say that in the case that he testifies, then that can come in, although we had to take his answer. If Mr. Hernandez would have lied, we would have been stuck with it. So, and the fact that a limiting instruction, several points was made by Judge Burns in the final instruction, I believe under the Ninth Circuit law does go a long way to removing any prejudices inherent in that. I want to address one point that Mr. Eddy discussed on the 609 on the conviction. That conviction was only 3 years old. The act was older. But the conviction was 3 years old. I believe the trial court is correct that the date of conviction is what controls. And the fact that the way I read the record, the fact that the judge also permitted the government to point out that that was based on a drug conviction was a request of defense counsel. And again, I want to make clear that it's my understanding, because Mr. Eddy indicated at the time that he didn't want the jury to believe that we were talking about two different acts. He wanted, since the jury was already going to hear about the 2000 event, he wanted to make sure they knew the 2009 event was the same one. And that makes sense. As a defense counsel, you don't want them thinking, getting counted double-dipping for the same offense. And I think that's important that the Court is aware. Mr. Hernandez raises several other points in his brief. I addressed them online. I'm willing to answer any questions Your Honor may have regarding those. If not, I would be happy to submit at this time. Do we have any questions? No. Okay. Thank you. Thank you, counsel. Do we have a couple minutes of rebuttal? Be careful. Briefly, I do now note that I did file a motion for a judgment notwithstanding verdict, as well as a motion for a new trial. And that would be a basis for Your Honors making a decision that that portion of the judgment that involved the amount of weight would be legally incorrect for legal reasons, based upon the facts that you have the authority to do that. And I believe that's something that should, frankly, be done. The cross-examination that I made of the expert did bring out that essentially it was mostly sugar, but because I didn't have all this information or testing and information and answers beforehand, I just didn't want to go down that road. But it was something I could mention to the jury, but it just wasn't enough. And it wasn't what we had with the post-trial testing to show the amount that it was non-cocaine, and the amount that it was insoluble, that really went right into and supported the defense theory of the case. And it would have been very powerful for me to be able to have that. I should have had this information. It wasn't Jenks material. It was Brady material. Thank you. Thank you very much, counsel. United States v. Hernandez will be submitted.
judges: Gleason, Wardlaw, Rawlinson